UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

         – v. –                              :              16 Cr. 837 (JPO)

NAVNOOR KANG,                                :

               Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
*Attorney for the United States of America*


Edward A. Imperatore
Joshua A. Naftalis
Assistant United States Attorneys
      - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of defendant Navnoor Kang and in response to Kang's sentencing submission filed on May 29, 2018 ("Def. Mem.").   As the parties agree, a proper application of the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") results in a Guidelines range of 210 to 262 months' imprisonment.   While the Government does not believe that a Guidelines sentence is necessary in this case, the Government does respectfully submit that a term of imprisonment of at least 120 months is warranted in this matter in light of Kang's egregiousness conduct, his flagrant abuse of his position of public trust, and his pervasive obstruction of justice.   Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I.      Offense Conduct

The Government agrees with the statement of offense conduct set forth in the April 27, 2018 presentence investigation report ("PSR").   (PSR ¶¶ 14-56).

As described in more detail below, from 2014 through 2016, Navnoor Kang, a former director of the New York State Common Retirement Fund ("NYSCRF" or the "Fund"), participated in a scheme to defraud the NYSCRF and its members and beneficiaries, and to deprive the NYSCRF of its right to Kang's honest services.   As part of the scheme, brokers paid Kang bribes, in the form of entertainment, lavish trips, expensive watches, drugs, strippers, and prostitutes.   Kang's secret receipt of such bribes was strictly forbidden by the NYSCRF and New York State law.   (PSR ¶¶ 20-21).

In exchange for the bribes, Kang abused his position by steering billions of dollars of NYSCRF fixed-income business to the brokers, who personally earned millions of dollars in commissions.   In so doing, Kang breached his fiduciary duty to make investment decisions in

the best interest of the NYSCRF and its members and beneficiaries, free of any conflict, and deprived the NYSCRF of its right to Kang's honest services.   (PSR ¶ 22).

### A.   Background

The NYSCRF is a pension fund administered for the benefit of public employees of the State of New York.   The third largest public pension fund in the United States, the NYSCRF holds approximately $184 billion in assets in trust for a total of more than one million retirees and other beneficiaries.   During fiscal year 2015, the NYSCRF paid out approximately $10.9 billion in retirement benefits.   The NYSCRF is administered by the New York State Comptroller, the chief fiscal officer of New York State.   The New York State Comptroller, as the NYSCRF's sole trustee, appoints directors and investment officers to make investment decisions on behalf of the NYSCRF and its members and beneficiaries.   The directors and investment officers owe a fiduciary duty to make investment decisions in the best interests of the NYSCRF and its members and beneficiaries, and to do so without any conflict of interest and free of self-dealing.   (PSR ¶¶ 14-15).

From January 2014 through February 2016, Kang served as Director of Fixed Income and Head of Portfolio Strategy for the NYSCRF.   In that capacity, Kang was responsible for investing more than $53 billion in fixed-income securities and was entrusted with discretion to manage those investments on behalf of the NYSCRF.   Kang owed a fiduciary duty to the NYSCRF and its members and beneficiaries, and was required to make investment decisions in their best interests.   Both New York State law and NYSCRF policies prohibited Kang and other NYSCRF employees from receiving any bribes, gifts, benefits, or consideration of any kind. (PSR ¶ 16).

2

From 2012 through September 2015, co-defendant Deborah Kelley was Managing Director of Institutional Fixed Income Sales at Sterne Agee, a New York, New York-based broker-dealer.   (PSR ¶ 17).   In May 2018, Kelley pled guilty to conspiracy to commit securities fraud and honest services wire fraud for her participation in Kang's scheme.[1]

From 2013 through 2016, co-defendant Gregg Schonhorn was Vice President of Fixed Income Sales at FTN Financial ("FTN"), a New York, New York-based broker-dealer.   (PSR ¶ 18).   In December 2016, Gregg Schonhorn pled guilty to securities fraud, honest services wire fraud, and obstruction of justice for his participation in Kang's scheme.

Kelley and Schonhorn were each responsible for executing fixed-income trades, including the purchase and sale of corporate and municipal bonds, on behalf of their respective clients, including the NYSCRF.   Kelley and Schonhorn earned commissions based upon the fixed-income trades that they executed.   (PSR ¶ 19).

Just as the NYSCRF prohibited Kang from receiving gifts or things of value from clients, Sterne Agee and FTN had written policies that restricted their employees from paying for gifts or other benefits for clients.   (PSR ¶¶ 24-29).

---

[1] This Court subsequently sentenced Kelley, who was far less culpable than Kang and presented mitigating factors that are not present in Kang's case, to three years' probation with six months' home confinement.   In articulating Kelley's sentence, the Court observed: "It is also important to contrast her culpability to that of Mr. Kang, who was the one who had the fiduciary duty and responsibility to the public pension fund here."   (Sentencing Tr., Dkt. No. 44, at 28).   Among other things, Kelley was not aware of and did not participate in Kang's receipt of bribes from Schonhorn, and the Court observed that the bribes she paid were "less substantial, less lavish and less obvious than what we think of as bribes when compared to those of the other defendant, Mr. Schonhorn."   (*Id.* at 27).   The Court also expressly took into account various mitigating factors that are not present in Kang's case, including Kelley's community work and public service, and her personal suffering and poor health.   (*Id.* at 28).   Kelley, unlike Kang, also attempted to cooperate with the Government.

3

### B.  The Scheme to Steer NYSCRF Fixed-Income Business in Exchange for Secret Bribes

When Kang joined the NYSCRF as its fixed income director in February 2014, he fully understood that the NYSCRF did not allow him to receive any entertainment or benefits whatsoever, and that the brokerage firms with which he transacted did not allow its brokers to entertain public employees.   In fact, Kang advised Schonhorn that the NYSCRF did not allow Kang to receive any entertainment or benefits, and that Schonhorn could not disclose any entertainment with Kang on his expense reports.   (PSR ¶ 30).

Nevertheless, beginning in early 2014, and continuing throughout the scheme, Kang began accepting what would total more than approximately $100,000 in secret bribes from Schonhorn, Kelley, and others in exchange for steering fixed-income business to their respective brokerage firms.   With the knowledge and approval of Kelley and Schonhorn, Sterne Agee and FTN ultimately executed a large volume of trades placed by Kang.   Kang's trades resulted in the payment of millions of dollars in total commissions to Sterne Agee and FTN, of which Schonhorn and Kelley personally earned approximately 35 to 40 percent.   (PSR ¶ 30).

Kang's text messages with his former girlfriend during his early days on the job at the NYSCRF offer a window into Kang's greed, arrogance, and motive for engaging in the scheme:

> just got to the office. It's so JV [junior varsity]. I have a cubicle. . . .
> I don't think I can do this for longer than I have to
> You have to pay for water too . . .
> I'm surprised I don't have to pay for the toilet . . .
> Very different from the days of private jets, limos, free food all the time, ocean view, and perfect weather . . .
> Oh boy. . . I'm not sure how long I can stay in public service . . .

4

Guy who I met with at blackrock called me. He might end up on the board of the firm but he will be a huge help if/when I need to make a move to something more financially lucrative . . .

I'm so motivated to get out of Albany in the next 2 years.

I badly want to get something going where I don't have to worry about money any more.

(Chat messages, Jan.31-Feb. 1, 2014, Exhibit A).

Thereafter, in February 2014 and April 2014, Schonhorn took Kang on weekend trips to Montreal in exchange for NYSCRF fixed-income business.   On each trip, Schonhorn paid more than approximately $10,000 for Kang's airfare, hotel, meals, nightclub bottle service, and cocaine, as well as for Kang's close friend, another NYSCRF employee ("CC-1"), to attend and participate in certain of the outings.   Kang did not disclose the trips or the benefits he received from Schonhorn, or the conflicts of interest inherent therein, to the NYSCRF.   (PSR ¶ 31).

When Kang first arrived at the NYSCRF, there was a very small numbers of broker-dealers approved to do fixed-income business with the NYSCRF.   Sterne Agee and FTN were not on the list.   Kang decided to expand the list of approved broker-dealers under the purported justification of facilitating additional liquidity for the NYSCRF.   On June 10, 2014, at Kang's direction, the NYSCRF initiated a fixed-income broker-dealer search.   Interested broker-dealers were required to submit applications, which were then reviewed by Kang.   Shortly thereafter, Kelley and Schonhorn submitted applications to the NYSCRF on behalf of Sterne Agee and FTN, respectively, to become approved NYSCRF broker-dealers.   (PSR ¶¶ 32-33).

In exchange for NYSCRF business, and while Sterne Agee's application to become a registered NYSCRF broker-dealer was pending, Kelley paid Kang in the form of thousands of dollars in entertainment and other personal expenses.   In October 2014, Kelly paid for various personal expenses associated with a long-weekend trip that Kelley and Kang took with Kelley's

husband and Kang's then-girlfriend ("Individual-1") to New Orleans, including for Kang's ticket to a Paul McCartney concert, tours, and Kang's meals and drinks.   The cost of the trip included $8,000 for the four of them on meals, drinks, and entertainment, including $6,000 for four VIP tickets to the McCartney concert.   (PSR ¶¶ 34, 36).

Notwithstanding that the trip violated the NYSCRF's and Sterne Agee's policies, Kelley attempted to expense costs associated with the trip to Sterne Agee and filed fraudulent expense reports at Sterne Agee omitting Kang's name.   To conceal that Kang was the recipient of the expenses, Kelley intentionally omitted the names of Kang and Individual-1 on the expense reports, instead listing clients from a private firm who did not attend the trip.   Kang likewise did not disclose the trip, the benefits he received, or the conflicts of interest inherent therein, to the NYSCRF.   (PSR ¶ 37).

In the meantime, in order to circumvent the NYSCRF's restrictions against doing business with broker-dealers who were not on the approved list, Kang orchestrated pass-through transactions known as "step-out" trades to steer fixed-income trading business to Sterne Agee and FTN.   Specifically, Kang, Kelley, and Schonhorn arranged for Sterne Agee and FTN to broker trades for the NYSCRF through a NYSCRF-approved broker.   In return, Kang arranged for the NYSCRF to pay a commission to the approved broker, which the approved broker shared with Sterne Agee and FTN without disclosure to the NYSCRF.   At times, these "step-out" trades resulted in the NYSCRF paying more in commissions than it would have if it had traded directly with an approved broker, without the involvement of Sterne Agee and FTN.   In turn, Kelley and Schonhorn pocketed a percentage of the commissions paid to their respective employers.   (PSR ¶¶ 38).

6

One month after the New Orleans trip, on November 6, 2014, Kang submitted a memorandum to his supervisor, the chief investment officer and deputy comptroller of the NYSCRF, recommending that Sterne Agee and FTN, among other brokerage firms, be formally approved to do fixed-income business with the NYSCRF.   In his memorandum, Kang represented that "[t]hese additional brokers will enable [NYSCRF] staff to address the immediate needs of access to additional liquidity, best execution, and more complete asset class coverage." Kang did not disclose that, by the time of this memorandum, Kang had already received tens of thousands of dollars in secret personal benefits from Kelley and Schonhorn.   (PSR ¶ 39).

In the fall of 2014, as Kang was arranging for Sterne Agee and FTN to receive formal approval to do business with the NYSCRF, the personal benefits that Kang extracted from Gregg Schonhorn escalated.   Schonhorn spent thousands of dollars on Kang at strip clubs, on dinners at upscale New York restaurants, hotel reservations, bottle service at nightclubs, concerts, tickets to the U.S. Open tennis tournament, Broadway shows, and other events, and cocaine and crack cocaine.   Schonhorn also handed Kang thousands of dollars in cash for Kang to pay for prostitutes, strippers, and Kang's personal expenses.   (PSR ¶ 40).

In February 2015, in exchange for NYSCRF fixed-income business, Kelley paid for Kang and Individual-1 to take a long-weekend ski trip to Park City, Utah.   In violation of NYSCRF and Sterne Agee's policies, Kelley paid for, among other things, approximately $11,000 for a hotel room, meals, cocktails, limousine service, and skiing for both Kang and Individual-1. Notwithstanding that Sterne Agee's policies prohibited such expenses, Kelley again attempted to expense those costs associated with the trip to Sterne Agee and again filed false expense reports omitting Kang's and Individual-1's names.   Instead, Kelley falsely listed other individuals in the

securities industry on her false expense reports to Sterne Agee.   Kang did not disclose the trip, the benefits he and Individual-1 had received from Kelley, or the conflicts of interest inherent therein, to the NYSCRF.   (PSR ¶ 41).

In late 2015, Kang told Gregg Schonhorn that Kang wanted a luxury wristwatch.   In response to Kang's request, in November 2015, Schonhorn took Kang to a luxury watch store on Madison Avenue in Manhattan and purchased a Panerai wristwatch for Kang for approximately $17,420 using Schonhorn's personal credit card.   This was not the first instance in which Schonhorn had purchased a wristwatch for Kang in exchange for business.   In or about 2012, while Kang was working at Guggenheim, a private investment firm, Schonhorn had bought Kang a Rolex wristwatch for approximately $8,000 in exchange for fixed-income business from Guggenheim.   Kang was ultimately terminated from Guggenheim for failing to comply with Guggenheim's internal reporting requirements for the receipt of gifts and entertainment from counterparties.   In seeking a job with the NYSCRF, Kang lied to the NYSCRF about his termination from Guggenheim.   (PSR ¶¶ 42-43).

### C.  Kang Steers Fixed Income Business to Kelley and Schonhorn

As the bribes that Kelley and Schonhorn paid to Kang increased, so too did their firms' fixed-income business with the NYSCRF.   According to NYSCRF records, the value of the NYSCRF's domestic bond transactions with FTN skyrocketed from zero in the fiscal year ending March 31, 2013, to approximately $1.5 million in the fiscal year ending March 31, 2014, to approximately $858 million in the fiscal year ending March 31, 2015, and to approximately $2.378 billion in the fiscal year ending March 31, 2016.   FTN became the third largest broker-dealer with which the NYSRCF executed transactions in domestic bonds for the fiscal year ending March 31, 2016, having not even been on the approved list in the fiscal year ending

March 31, 2013.   As the NYSCRF's third largest broker-dealer in this asset class, FTN brokered approximately eight percent of the total value of the NYSCRF's domestic bond transactions – a figure greater than that of all but two of the major international banks and brokerage houses on the list.   (PSR ¶ 44).

Similarly, the value of NYSCRF's domestic bond transactions with Sterne Agee dramatically escalated from zero in the fiscal year ending March 1, 2014 to approximately $156 million in the fiscal year ending March 1, 2015, and to approximately $179 million in the fiscal year ending March 1, 2016. (PSR ¶ 45).

In exchange for the personal benefits that Gregg Schonhorn purchased for Kang, Kang caused the NYSCRF to pay commissions of up to approximately $1 million per month to FTN for brokering fixed-income transactions.   At times, Kang used FTN to broker the purchase or sale of fixed-income securities when the NYSCRF had the ability to trade directly with a counterparty without the aid of a broker.   In other instances, by steering trades directly to FTN, Kang bought or sold fixed-income securities on behalf of the NYSCRF at prices that were less favorable to the NYSCRF and paid higher commissions than if Kang had canvassed the market more broadly, as his fiduciary duty required.   (PSR ¶ 46).   Kang told Schonhorn that an "extra basis point or two" on Schonhorn's commission did not matter because it was "not my [Kang's] money."

In exchange for Kelley's bribes, Kang caused the NYSCRF to pay commissions of approximately $520,191.10 to Sterne Agee for brokering fixed-income transactions.   (PSR ¶ 47).

Notwithstanding the fiduciary duties that Kang owed to the NYSCRF and its members and beneficiaries, at no time did Kang disclose to the NYSCRF any of the entertainment or other benefits that he received from either Kelley, Schonhorn, or any other broker, or the conflicts of interest inherent therein.   (PSR ¶ 48).

### D.  Kang's Manipulation of NYSCRF's Internal Controls

Kang abused his trusted position at NYSCRF by taking sophisticated steps to manipulate NYSCRF's internal controls in order to conceal his scheme.   At the time Kang began his employment, NYSCRF's fixed-income desk used a "paper ticket" system to process and document fixed-income trades.   Trades, which were recorded by hand on a paper form, required two signatures: one from the investment officer confirming the trade and one by the fixed-income director approving the trade.   In addition to listing the details of the security involved in the trade and the price of the security, the paper ticket also reflected the name of the broker involved in the transaction.   Kang, however, eliminated a record contemporaneously documenting the identity of the broker used in each transaction.   Rather than merely reviewing and approving the trades of his subordinates, as had been the practice when Kang joined the NYSCRF, Kang actively traded himself.   Under the new system implemented by Kang, no one approved the trades that Kang personally made.   Rather, Kang instructed a subordinate investment officer at the NYSCRF to approve the transactions proposed by the broker with whom Kang was transacting.   Kang used this corrupt trading process to steer business to his accomplices and create the false impression that most transactions with his accomplices were conducted by investment staff and then approved by him.

Kang, moreover, systematically eliminated internal NYSCRF documentation that would have identified Kang's transactions with his co-conspirators.   For example, Kang modified a

10

weekly trading report that was circulated internally at NYSCRF by omitting the identities of the brokers used in NYSCRF's trades.   He also eliminated a monthly "volume report" that reflected the volume of fixed-income business of each broker transacting with NYSCRF.   Although Kang advised his staff that he was eliminating the antiquated paper ticket system and reports, he did not implement an electronic database or report reflecting the identities of his brokers, the volume of their business, or the fact that Kang was personally trading with those brokers without the approval or oversight of anyone else at NYSCRF.

Finally, as discussed above, Kang steered trades to his co-conspirators by using a third-party approved broker as an intermediary.   This technique, known as a "pass-through" or "step-out" transaction, was not regularly used by the NYSCRF and circumvented the NYSCRF's policy of using only approved brokers.   "Step-out" transactions also had the effect of concealing the volume of business done with Kang's co-conspirators because NYSCRF's trade data reflected only that the NYSCRF was transacting with the approved intermediary broker rather than FTN or Sterne Agee.

### E.  Kang and Kelley Agree to Lie to Keep the Scheme a Secret

In 2015, Kelley's conduct prompted Sterne Agee to initiate an internal investigation into her activities with Kang.   During the course of that investigation, Kelley was interviewed by Sterne Agee's outside legal counsel, and she agreed with Kang that she would repeatedly lie about the circumstances of the expenditures and who was present in Park City.   For example, Kelley falsely stated that the Park City hotel room used by Kang and his girlfriend was unoccupied during the ski trip, and that she did not pay for meals for Defendant Kang and his girlfriend.   (PSR ¶ 49).

Kelley instructed another Sterne Agee employee, who was present in Park City, Utah, to lie in the Sterne Agee internal investigation.   In a February 26, 2015 Bloomberg message to that employee, Kelley stated:   "Loose lips sink ships!   No talky re ski trip si vous plait."   (PSR ¶ 50).

### F.  Kang's Obstruction of the SEC Investigation

Following its internal investigation, Sterne Agee referred the matter to federal regulators, who initiated their own inquiries of Kelley's and Kang's conduct.   Thereafter, Kang and Kelley mounted a concerted campaign to lie to deceive regulators in order to keep their scheme a secret.

In October 2015, in response to a letter of inquiry from the Financial Industry Regulatory Authority, Inc. ("FINRA"), Kelley made a written submission under penalty of perjury in which she repeatedly lied about the circumstances of the expenditures and who was present in Park City, Utah.   (PSR ¶ 52).

In late 2015, the Securities and Exchange Commission ("SEC") opened an investigation into the entertainment and other personal benefits that Kelley had provided to Kang, and the SEC subpoenaed both Kang and Kelley for their testimony.   In advance of their testimony, Kang and Kelley agreed to align their stories and testify falsely before the SEC in order to conceal their scheme to provide personal benefits to Kang in exchange for NYSCRF fixed-income business. (PSR ¶¶ 32-33).

In late 2015 and early 2016, Kelley and Kang each perjured themselves under oath before the SEC about the Park City, Utah ski trip, among other things.   Kelley falsely testified that she had not paid for any part of Kang's and Individual-1's trip, with the exception of certain small expenses for which Kang had repaid her.   Kang likewise falsely testified in sworn testimony that he understood that Individual-1 had repaid Kelley for any expenses that Kelley had incurred on

12

behalf of Kang and Individual-1.   Kelley, moreover, never disclosed the existence of the New

Orleans trip despite the SEC's inquiries as to whether there were any additional travel or

expenses similar to the Park City trip.   (PSR ¶ 54).

Unbeknownst to the SEC, Kang called Schonhorn in late 2015 and admitted that Kang

was in trouble because the SEC had learned that Kelley had paid for Kang's expenses during the

Park City, Utah trip and had attempted to expense them to Sterne Agee.   Kang asked if

Schonhorn knew anyone who had the ability to fabricate receipts to make it appear that Kang had

paid for the trip himself.   Kang then instructed Schonhorn to call Individual-1, who had attended

the trip with Kang, and tell Individual-1 to give a check to Kelley to cover the costs of the trip to

make it falsely appear that Individual-1 was supposed to pay for Kang's and Individual-1's

expenses but had forgotten to do so.   Individual-1 ultimately refused to comply with this

request.   (PSR ¶ 55).

**G.  Kang's Obstruction of the Grand Jury Investigation**

In 2016, a federal grand jury in the Southern District of New York began investigating

Kang.   In June 2016, Gregg Schonhorn was served with a grand jury subpoena and subsequently

told Kang about the subpoena.   Shortly thereafter, in July 2016, Schonhorn began cooperating

with the Government.   In July and August 2016, Kang participated in meetings consensually

recorded by Schonhorn.   During those meetings, the following took place, among other things:

- Kang stated that he had turned off his phone because he was worried that his location
  could be tracked.   Kang suggested that Schonhorn change his phone number or get a
  "burner" phone so that he and Kang could continue to communicate.   Kang further
  stated that he did not save WhatsApp chats and did not have any email
  communications with Schonhorn, though Kang preserved pictures of the "girls" in
  Montreal.

13

- Kang stated that he and Kelley had aligned their stories for the SEC.   Kang explained that during his SEC testimony, Kang told the SEC he did not remember anything. This technique frustrated the SEC lawyers.   If the case ever progressed, it would get thrown out because Kang did not remember anything.

- Kang stated that he had gone to Panerai and tried to have his name removed from the registration for the watch that Schonhorn bought for Kang.   Kang also stated that he had shredded some papers related to the watch.

- Kang returned the Panerai watch to Schonhorn.   In order to hide the fact that Schonhorn had purchased the watch for Kang, Kang instructed Schonhorn to call Panerai's corporate headquarters and state that he believed he was putting Kang's name on a Panerai mailing list rather than the watch registration. (Indictment ¶¶ 39-42).

- Kang advised Schonhorn that if asked about the conversation in which he directed Individual-1 to reimburse Kelley, Schonhorn should state that he did not remember, as Kang had done.

- Kang gave his computer hard drives and the Rolex that Schonhorn had bought to CC-1 to store for him.   (The Government subsequently seized these items pursuant to a search warrant.)

- In response to a grand jury subpoena, Kang instructed Schonhorn to testify falsely that Kang had paid him back in cash for all expenses and that he did not remember a lavish dinner paid for by Schonhorn at Per Se in Manhattan.

## II.    Kang's Guilty Plea and Guidelines Calculation

In November 2016, Kang pled guilty to Count One of the Indictment, which charged him with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and Count Three of the Indictment, which charged him with conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1349 and 1346. Kang's plea agreement calculates his applicable Guidelines range as follows:

- Pursuant to U.S.S.G. §§ 3D1.1, 3D1.2(b) and (d), because Counts One and Three involve substantially the same harm, they are grouped together into a single Group.

- U.S.S.G. § 2C1.1 is the Guideline provision applicable to Counts One and Three.

14

- Pursuant to U.S.S.G. § 2C1.1(a)(1), because Kang was a public official, the base offense level is 14.

- Pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(K), because the value of the payment, the benefit received or to be received in return for the payment was more than $9.5 million but less than $25 million, 20 levels are added.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), because Kang was a public official in a high-level decision-making or sensitive position, four levels are added.

- Pursuant to U.S.S.G. § 3C1.1, because Kang willfully obstructed and impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offenses of conviction, and (2) the obstructive conduct related to Kang's offenses of conviction and any relevant conduct, two levels are added.

- Assuming that Kang clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a three-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a) and (b).

With a total offense level of 37 and a Criminal History Category of I, Kang's applicable Guidelines range is 210 to 262 months' imprisonment.   (PSR ¶ 9).

The calculation by the U.S. Probation Department ("Probation") of Kang's Guidelines range is the same in all respects as the calculation set forth in the plea agreement, except that Probation has determined that Kang is not entitled to receive any reduction, pursuant to U.S.S.G. § 5G1.1 for acceptance of responsibility in light of his obstruction of justice.   (PSR ¶ 69). Probation therefore determines that Kang's Guidelines range is 292 to 300 months' imprisonment.   (PSR at 27).   The Government stands by the Guidelines calculation of 210 to 262 months' imprisonment set forth in the plea agreement.   Probation recommends a sentence of 120 months' imprisonment.   (PSR at 27).

## III.   Discussion

Applying the factors set forth in 18 U.S.C. § 3553(a), including the need to reflect the

15

seriousness of the offense, afford just punishment, provide specific and general deterrence, and promote respect for the law, a substantial sentence of at least 120 months' imprisonment is sufficient but not greater than necessary to serve the goals of sentencing.

### A. The Nature and Circumstances of the Offense and the Need to Provide Just Punishment

First, the nature and circumstances of the offense and the need to provide just punishment weigh decidedly in favor of a sentence within the Guidelines range.

Kang's offense was very serious.   Kang flagrantly abused his position of public trust and fiduciary duty to the NYSCRF and its pension-holders by accepting cocaine, prostitutes, cash, and lavish trips and dinners for Kang's own personal benefit.   In doing so, Kang corrupted one of the nation's largest public pension funds and deprived NYSCRF's thousands of pension-holders of their right to Kang's honest services.   He also undermined the integrity of the fixed-income markets.   Rather than canvass the market broadly and objectively for fixed-income transactions, as his fiduciary duty required, Kang repeatedly steered more than a billion dollars of fixed-income business to the brokers who paid him secret bribes.   The chronology outlined above makes plain that Kang dangled lucrative NYSCRF business and the prospect of becoming an "approved" NYSCRF broker as a carrot to extract bribes from his co-conspirators.   Kang's crimes, moreover, were pervasive, systematically carried out, and involved the manipulation of NYSCRF's internal controls.   With full knowledge that what they were doing was wrong, Kang and his co-conspirators repeatedly lied to keep the scheme a secret.

To make matters worse, Kang committed his crimes in the wake of a major pay-to-play scandal involving the NYSCRF and a former New York State Comptroller and his staff.   In 2007, a special inspector general was appointed to oversee the NYSCRF and implemented a

16

series of reforms.   Ironically, Kang was hired by the NYSCRF during this period of reform as part of an effort to infuse the pension fund with young talent from the private sector.   However, within a month of joining the NYSCRF, Kang began to repeatedly and flagrantly violate the written "Code of Conduct" that was instituted by the NYSCRF in order to combat corruption.

And when Kang was caught by regulators, he chose to lie and obstruct justice.   He lied repeatedly under oath to the SEC, agreed with Kelley that she would lie to regulators and her employer, and directed Schonhorn to lie to the grand jury and destroy evidence.   There is no excuse or mitigating factor tempering the seriousness of Kang's crimes, which were motivated by greed and accomplished through exploitation of his trusted position and his willingness to lie and deceive at every turn.   The severity of Kang's misconduct weighs strongly in favor of a substantial sentence of imprisonment.

### B.      Kang's History and Characteristics

Contrary to Kang's arguments, Kang's history and characteristics weigh firmly in favor of a significant sentence of imprisonment.   Kang committed his offense out of pure greed and a total disregard for his fiduciary duty to the former public employees who invested in the NYSCRF.   This was also not Kang's first instance of corrupt conduct.   As a trader at Guggenheim, Kang received bribes from brokers in exchange for Guggenheim's fixed-income business.   He was fired for engaging in this misconduct—not, as he claims in his sentencing memorandum, because he "turn[ed] down a sexual proposition from a supervisor."   (Def. Mem. at 7).2   After his firing, Kang was not chastened.   Instead, Kang sought a position at a public

---

2 All of the evidence undermines Kang's unsupported claim that he left Guggenheim because a Guggenheim supervisor had propositioned him.   Attached hereto as Exhibit B is an internal Guggenheim memorandum (filed under seal), which makes clear that Guggenheim decided to

pension fund and lied about the circumstances of his termination by Guggenheim.   As soon as he arrived at the NYSCRF, he began engaging in a pay-to-play scheme involving billions of dollars of assets of public employees that had been entrusted to him.   This was not a fleeting aberration in conduct.   It was a sustained program of criminal conduct and lies.

Unlike many defendants who appear before the Court, Kang did not commit his crimes out of any pressing financial need.   Rather, as he emphasizes in his sentencing memorandum, Kang was a well-educated, successful fixed-income trader with a promising career.   Probation notes that Kang "was reared in a stable, middle-class home with a supportive family" and was financially well off at the time he committed his offenses.   (PSR at 28).   Kang engaged in the corruption scheme despite these advantages, and his lies to cover up the scheme and efforts to obstruct justice highlight his arrogance, contempt for his public employer, and belief that he is above the law.   Against the backdrop of Kang's education, experience, and financial well-being, Kang's brazen scheme weighs in favor of a Guidelines sentence.

### C.    The Need for Deterrence and to Promote Respect for the Law

There is an important need in this case for both specific deterrence and to promote respect for the law.   Before Kang joined the NYSCRF, he engaged in similar misconduct in his previous positon, accepting bribes in exchange for fixed-income business while at Guggenheim, a private investment fund.   When he was terminated by Guggenheim, he doubled down on his misconduct.   Kang lied to NYSCRF in order to obtain employment and engaged in a pervasive

---

terminate Kang because of his improper receipt and expensing of entertainment.   A witness from Guggenheim, who were interviewed by the Government, would testify that Guggenheim informed Kang during his exit interview that he was fired as a result of his improper and unreported receipt of entertainment.   In the event that Kang continues to dispute these facts and the Court determines that the dispute would bear upon the sentence to be imposed by the Court, the Government would respectfully request a *Fatico* hearing to elicit testimony from witnesses.

pay-to-play scheme involving the assets of public pension-holders.   Kang's extensive obstruction of both an SEC investigation and a grand jury investigation likewise reflect his contempt for the law.   A significant sentence in this case would also promote deterrence by refuting Kang's repeated assertions that his trading practices with FTN and Sterne Agee were effectively business as usual and ultimately beneficial to the NYSCRF.

The need to promote respect for the law and deter other public officials from engaging in acts of corruption requires a substantial sentence here, particularly given the history of corruption that has affected the NYSCRF.   Unfortunately, Kang and would be fraudsters like him will always be allured by the billions of dollars of retirement funds stewarded by the NYSCRF and similar entities as well as the related possibility of massive trading fees.   Justice requires a strong message of deterrence.   Kang's sentence should communicate that these types of violations of the public trust will be met with a significant sentence.

Similarly, the need for a strong message of deterrence is driven by the fact that bribery and securities fraud schemes are both highly lucrative and often difficult to detect.   *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").   Anything less than a substantial sentence of imprisonment would further erode the public's confidence in the integrity of the NYSCRF and the public markets by sending the message that even when financial professionals are caught engaging in a bribery scheme, they are only lightly punished.   To deter criminal conduct by public officials, effectuate the purpose of the securities fraud laws, and send an

19

appropriate message that this type of fraud will not be tolerated, a significant sentence is warranted.

Moreover, Kang's behavior during his period of pretrial supervision counsel in favor of a substantial period of incarceration.   Even though he had pleaded guilty to serious crimes, Kang approached his supervision casually and without regard for its seriousness.   He continued to use drugs.   And when he was caught, he lied to the Court.   His claim that he was "roofied" is incredible.   That he advanced this fanciful story underscores that Kang's lack of respect for the Court and the fact that he has not been deterred from engaging in criminal conduct.

### D.  Kang's Arguments Lack Merit

Kang advances various arguments in his sentencing submission in support of a well below-Guidelines sentence.   Each should be rejected.

*First*, Kang argues that he is less culpable than Kelley and Schonhorn.   This argument is laughable.   Kang was unquestionably the most culpable member of the conspiracy, and should be sentenced as such.   Unlike Kelley and Schonorn, Kang held a position of trust and owed duties to his employer and the millions of New Yorkers whose funds he managed.   He knowingly and willfully violated those duties out of greed—to enjoy a lavish lifestyle of entertainment, parties, drugs, and prostitutes.   Schonhorn has accepted responsibility for his role in this conspiracy and cooperated with the Government.   And Kelley is plainly in a different position.   She was the least culpable of the conspirators who have been charged in this case. Kang's obstruction of justice, which involved attempting to corrupt both an SEC investigation and a grand jury investigation, was likewise far more pervasive than Kelley's.

*Second*, Kang contends that "there is no evidence that there were any losses suffered by

20

the NYSCRF or the state of New York as a result of the conduct of Mr. Kang in this case."
(Def. Mem. at 24).   Indeed, he claims that his conduct often resulted in the NYSCRF receiving
"the best price on the trade."   (*Id.* at 20).   As an initial matter, there is, of course, no
requirement that the victim of a fraud suffer monetary loss.   *See United States* v. *Dinome*, 86
F.3d 277, 283 (2d Cir. 1996) ("the government need not prove that the scheme successfully
defrauded the intended victim"); Sand et al., *Modern Federal Jury Instructions* § 44-4 ("it is not
necessary that the government prove that the defendant actually realized any gain from the
scheme or that the intended victim actually suffered any loss").   Indeed, Kang concedes as much
in his sentencing memorandum: "Indeed there no need or statutory element of financial loss
required to make Kang's conduct unlawful."   (Def. Mem. at 25).   Kang's self-serving and
unsupported claim that his conduct did not harm the fund or was ultimately beneficial to his
employer is the same argument that is often made by defendants involved in corruption cases.
But it ignores the corruption of the process and the erosion of public trust in important
institutions like the NYSCRF.   It likewise ignores that the NYSCRF (along with the millions
who trust it with their pension savings) was harmed by being deprived of Kang's honest services.
That is exactly the form of corruption that the offenses to which Kang pled guilty seek to punish.

In any event, as set forth in the PSR, Kang's conduct did harm the NYSCRF financially
in three ways that are albeit difficult to quantify specifically: (1) Kang's use pass-through trades
to execute the scheme at times resulted in NYSCRF's paying higher commissions, as the
transactions involved a redundant broker; (2) Kang, at times, used FTN to broker the purchase or
sale of fixed-income securities when the NYSCRF had the ability to trade directly with a
counterparty without the aid of a broker, costing the NYSCRF additional funds; and (3) in

21

certain other instances, by steering trades directly to FTN, Kang bought or sold fixed-income securities on behalf of the NYSCRF at prices that were less favorable to the NYSCRF and paid higher commissions than if Kang had canvassed the market more broadly, as his fiduciary duty required.   (PSR ¶ 46).

*Third*, Kang's argument that he "did not have unfettered discretion" and that "[f]ixed income investments were closely monitored" is wrong.   (Def. Mom. at 24).   As noted above, Kang manipulated and corrupted the NYSCRF's trading process to eliminate the checks on his trading to further his scheme.   He did so to cover up his fraud and continue it.

*Fourth*, Kang claims that he engaged in this bribery scheme because he had "a severe lapse in judgment," and he "did not benefit substantially from his role in the scheme."   (Def. Mem. 25 (original emphasis omitted)).   This position should be swiftly rejected.   Kang knew exactly what he was doing: violating blackletter NYSCRF policy and New York State law to line his own pocket.   He sought and accepted bribes because his New York State salary did not support the Wall Street lifestyle with which he was accustomed.   And he took the job with the NYSCRF because he had been fired by Guggenheim for violating firm policy.   In other words, King did not have a momentary lapse in judgment.   Paying-to-play was how Kang did business. Moreover, Kang personally profited extensively from his scheme, obtaining approximately $100,000 in illicit entertainment, gifts, and payments.

## IV.   Forfeiture and Restitution

Pursuant to the plea agreement, Kang agreed to forfeit $78,716, and a preliminary consent order of forfeiture was entered in that amount at Kang's guilty plea proceeding.

In connection with Kelley's sentencing, the Court ordered Kelley to pay restitution in the

total amount of $242,724.17 to the NYSCRF on a joint and several basis with Kang and

Schonhorn.   (Dkt. No. 57).   For the reasons set forth in the Government's February 12, 2018

letter, the Government requests that the Court enter a similar order with respect to Kang and hold

Kang jointly and severally liable in the same amount.   A draft restitution order is attached as

Exhibit C.

**V.     Conclusion**

For the foregoing reasons, the Government respectfully submits that Kang should receive

a substantial sentence of at least 120 months' imprisonment, as such a sentence is sufficient but

not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   _____/s/_____
Edward A. Imperatore
Joshua A. Naftalis
Assistant U.S. Attorneys
212-637-2327/2310

cc:    Mark Geragos, Esq.
Tina Glandian, Esq.